IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALVARO IBARRA,<br><br>        Petitioner,<br><br>  vs.<br><br>M. MCDONALD, Warden,<br><br>        Respondent. | No. C 10-01145 JW (PR)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |

Petitioner, a state prisoner incarcerated at the High Desert State Prison in Susanville, has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state conviction. The Court reviewed the petition and ordered respondent to show cause why a writ of habeas corpus should not be granted. Petitioner's motion to stay the case to allow him to exhaust additional issues in state court was denied because he had noy shown good cause for his failure to exhaust before filing this petition. See Rhines v. Weber, 544 U.S. 269, 277 (2005) (stay may be granted only if a petitioner shows good cause for failure to exhaust earlier and that his or her issues are potentially meritorious). Respondent filed an answer with a supporting memorandum and exhibits. Petitioner filed a traverse. For the reasons set out below, the petition will be denied.

# BACKGROUND

Petitioner was found guilty in the Monterey County Superior Court of attempted premeditated murder and assault with a firearm. The jury also found true various enhancements. The trial court sentenced appellant to a state prison term of 40 years to life.

Petitioner appealed the conviction; the state appellate court affirmed the conviction and the state high court denied review. Petitioner filed the instant federal habeas petition on March 17, 2010.

The California Court of Appeal set forth the following summary of facts[1]:

> Joel Arciniega and his girlfriend Maria Adalpe were walking down a street in King City around 11:30 p.m. on January 20, 2006. Two men, appellant and his cousin Miguel Ramos, got out of a car parked across the street and approached them. Arciniega had known appellant since third grade and both Arciniega and Adalpe knew appellant by his nickname "Burrito." Some months earlier, Arciniega and appellant had engaged in a fist fight based on their memberships in rival gangs. Ramos put a gun to Arciniega's head. Arciniega shoved Adalpe behind him to protect her. Appellant "socked" Arciniega in the mouth. Appellant told Ramos, "Shoot the scrap, shoot the scrap." Ramos pointed the gun at Arciniega's stomach. Appellant and Ramos started to walk away and then Ramos turned and shot Arciniega in the hip. Ramos and appellant then ran to the car and drove away.
>
> Adalpe ran to a nearby house where her brother's friend lived. Arciniega did not want the police to be called; he wanted his friend to come and pick him up and take him to the hospital. After spending some time at Adalpe's house and another friend's house, Arciniega was taken to the hospital.
>
> A police officer came to the hospital to talk to Arciniega. Arciniega did not want to talk to the officer but eventually told him that a car had driven past him with two young men in it. Arciniega told the officer that the passenger "hollered out scraps or F scraps, which is a very negative term for Sureno gang members." He told the officer that he did not know who these people were. Explaining at trial why he had not been truthful with the officer, Arciniega testified, " 'Cause I don't want to seem a rat."
>
> While Arciniega was still in the hospital recovering from surgery, his family came to visit him. He testified, "I was honest with my family." He told his sister Cynthia Arciniega that Burrito had hit him in the face and that Burrito's cousin had shot him. Cynthia told another brother and her mother, who called the police. Although Arciniega did not approve of his family contacting the police, at his family's urging he told the officer what had happened. He also picked appellant and Miguel Ramos out of photo line ups. Adalpe also identified appellant and testified similarly about his conduct.

---

[1] People v. Ibarra, No.H031958, California Court of Appeal, Sixth Appellate District (Sept. 23, 2008). (Resp't Ex. E.)

In September 2006, when Arciniega was in Monterey County Jail, a defense investigator interviewed him. Arciniega told the investigator that he did not know "the shooter or the one next to him." He testified that he said this because he was housed in a Sureno pod and it was important to him that he not be "labeled a rat" because it was "against the rules" for Surenos to "rat on people." He said that if the Surenos found out that he had told the investigator who had been involved in the shooting, "they could, you know, kill me or something." Arciniega testified that, rather than "ratting" on people to the authorities about having been victimized by a rival gang, the preferred method is to "Tell your gang members and they'll do something about it." Arciniega testified that he had been a Sureno for four years but that he did not want to be one anymore. He testified that now that he had a wife and a baby he felt it was not worth "getting killed for a color."

The prosecution introduced into evidence recordings and transcripts of two telephone calls appellant made from the jail. In one, appellant calls Miguel Ramos's telephone number and asks to speak to "Miguel." In a conversation in both Spanish and English, Ramos told appellant that Ramos had taken the "things far away." An officer testified that based on his experience working with gangs and jail inmates, the "things" referred to were firearms. Ramos also discussed that a witness has to "say it in your face, they go up to the stand and they can, they can say it over here to the cops over there with the cop. But a lot of them, they won't fucking to up there, 'ey." In a call appellant made to his mother, he said that the police "don't have any proof" and that "perhaps in three days I get out." He said "just remember that I was there in the house."

Other witnesses provided information in support of the charged gang allegations concerning the primary activities of the Norteno criminal street gang. An officer testified that appellant was an active Norteno gang member. The prosecution played a DVD made from viewing appellant's MySpace account page in which appellant raps about his gang associations and the rivalry between Nortenos and Surenos. A defense investigator testified about inconsistent statements made by Arciniega and Adalpe concerning the identity of Arciniega's assailants.

## DISCUSSION

A.  Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

Even if the state court decision was either contrary to or an unreasonable application of clearly established federal law, within the meaning of AEDPA, habeas relief is still only warranted if the constitutional error at issue had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 796 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

Lastly, a federal habeas court may grant the writ it if concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. Id. §2254(e)(1).

B.  Legal Claims and Analysis

Petitioner raises two claims for federal habeas relief: (1) the trial court violated his Sixth Amendment right to confront witnesses; and (2) his due process rights were violated when he was given an "unauthorized sentence."

 1.  Sixth Amendment Claim

Petitioner contends that his Sixth Amendment Confrontation Clause rights were violated when the trial court admitted a recording of a telephone call he made from jail, without the person to whom he was speaking appearing at trial for cross-examination. The court of appeal set out the factual background for this claim:

> During pretrial motions, defense counsel objected to the introduction into evidence of recordings and transcripts of telephone calls appellant made from the jail. At the beginning of the call appellant made to Miguel Ramos's telephone number, a recording of a cheery female voice announced, "This is a collect call from an inmate at the county jail" and gave instructions about how to accept charges. The voice then said, "This call is subject to monitoring and recording. Thank you for using Evercom." Someone other than Ramos answered the phone and appellant asked for "Miguel." When Ramos came to the phone, appellant started talking, and Ramos immediately told him, "Don't say nothing, nothing on the phone...." Appellant and Ramos then had the conversation that included Ramos telling appellant that he had taken the "things far away."
>
> Defense counsel argued that any statements by Ramos were hearsay and that "any admission of [Ramos's] statements violated the Confrontation Clause of the Sixth Amendment" citing Crawford v. Washington (2004) 541 U.S. 36 (124 S.Ct. 1354) ( Crawford ). Counsel referred to the recorded message at the beginning of the call and argued, "because of the admonishment at the beginning of the recording that it's being recorded, that clearly it could be used by law enforcement and it falls within the purview of Crawford." The trial court overruled the objection saying, "It is clearly a party admission in view of the context of the answers given to the statements and questions that are made."

Ex. E at 3-4.

///

///

The court of appeal rejected the claim:

> Crawford speaks in terms of an examination by law enforcement leading to a statement. The telephone conversation here was not in any way an examination by law enforcement. No questions were asked by law enforcement. Furthermore, Ramos's statements to appellant were neither formal nor made to a governmental officer or agent. The Davis court held that with respect to a police interrogation conducted for the purpose of investigating a crime, the requirement of formality is met because a false statement to a police officer in the course of an investigation may result in criminal prosecution. (Davis, supra, 547 U.S. at pp. 827-830.) Ramos did not risk prosecution if he lied to appellant. Nor could either appellant or Ramos be considered to have been acting as agent of the police or the prosecution. Ramos advised appellant at the beginning of the call, "don't say anything," clearly indicating that he wished exactly the opposite, that their statements be oblique enough that they could not be used by the prosecution as information about the crime. Rather, given their relationship, Ramos was more akin to an acquaintance. (Crawford, supra, 541 U.S. at p. 51; Davis, supra, 547 U.S. at p. 823.)
>
> This recorded jailhouse telephone conversation is closer to the "off-hand, overheard remark" statements identified in Crawford as not implicating the core concerns of the confrontation clause. This was the conclusion that was reached in State v. Chio Hang Saechao (2004) 195 Ore.App. 581 [98 P.3d 1144]. Appellant distinguishes Saechao noting "there the court never discussed whether that call had been preceded by an admonition." Referring to the recorded statement at the beginning of the call, appellant argues that "While the recording does not say why the call may be monitored or recorded, appellant submits that the reason is apparent-so that governmental officials can monitor possible illegal activity." Appellant argues that the "post admonition statements are thus analogous to statement made after a criminal suspect is advised of Miranda warnings."
>
> Although telephone calls from the jail do begin with the announcement that "this call is subject to monitoring and recording," this does not mean that the primary purpose of recording jail telephone calls is to obtain evidence. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, with certain limited exceptions, prohibits the unauthorized interception of "any wire, oral, or electronic communication." (18 U.S.C. § 2511(1)(a)). These protections apply to prisoners and prison monitoring. (U.S. v. Amen (2d Cir.1987) 831 F.2d 373, 378.) The admonition is given to provide the prisoner with meaningful notice that telephone calls over the jail phones are subject to monitoring, and thus the prisoner's decision to engage in conversations over those phones constitutes implied consent to that monitoring and takes any wiretap outside the prohibitions of the federal law. (See People v. Loyd (2002) 27 Cal.4th 997.) This admonition, given to make the recording of the conversation permissible under federal wiretapping laws, does not serve to transform a cagey conversation between associates into an examination by law enforcement. The trial court did not err and did not deny appellant his right to confront witnesses by admitting the evidence of the jail phone calls.

Id. at 7-8.

///

///

### a. Standard

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The Confrontation Clause bars the admission of "testimonial" statements made by persons who are not subject to cross-examination regardless of whether a hearsay exception would otherwise allow the admission of the statements. Crawford v. Washington, 541 U.S. 36, 68-69 (2004). "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51 (citations and quotation marks omitted); see id. ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Although the Court did not precisely define the term "testimonial" in deciding Crawford, it did bar the state from introducing out-of-court statements which are testimonial in nature, unless "the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Id. at 59.

Following Crawford, the Supreme Court distinguished testimonial and nontestimonial statements to police, stating that:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 547 U.S. 813, 822 (2006)

Quite recently, the Supreme Court has elaborated:

> Davis did not "attemp[t] to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial." Id., at 822, 126 S.Ct. 2266. [Footnote omitted.] The basic purpose of the Confrontation Clause was to "targe[t]" the sort of "abuses" exemplified at the notorious treason trial of Sir Walter Raleigh. Crawford, 541 U.S., at 51, 124 S.Ct. 1354. Thus, the most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial. [Footnote omitted.] See id., at 43–44. Even where such an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair

>to the accused if they are untested by cross-examination. Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial. When, as in <u>Davis</u>, the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the Clause. But there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.

<u>Michigan v. Bryant</u>, 131 S.Ct. 1143, 1155 (2011).

        b.    <u>Analysis</u>

<u>Michigan v. Bryant</u> makes clear that what matters for determining whether a statement is "testimonial," and thus subject to <u>Crawford</u>, is whether, viewed objectively, the "primary purpose" of procuring the statement was to create "an out-of-court substitute for trial testimony." <u>Id.</u> "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." <u>Id.</u>

In <u>Davis</u> the Supreme Court gave as examples of statements that "were clearly non-testimonial," statements made "unwittingly to a Government informant" and "statements from one prisoner to another," statements that are analogous the Petitioner's statement at issue here. <u>See</u> <u>Davis</u>, 547 U.S. at 825. The Court concludes that Petitioner's statements in his telephone call from jail clearly were not intended as a substitute for trial testimony, <u>Michigan v. Bryant</u>, 131 S.Ct. 1155, made with an "eye towards trial," <u>Crawford</u>, 541 U.S. at 51, and thus were not testimonial. Admission of the conversation did not violate Petitioner's Confrontation Clause rights. <u>See also</u> <u>United States v. Dale</u>, 614 F.3d 942, 956 (8th Cir. 2010) (co-defendant's statement to fellow prisoner who was wearing a wire held not testimonial); <u>Saechao v. Oregon</u>, 249 Fed. App'x 678, 679 (9th Cir. 2007) (tape recorded statement by co-defendant during jailhouse telephone call to a friend not testimonial). This claim is without merit.

///

### 2. <u>Sentencing</u>

Petitioner contends that his sentence was "unauthorized by state law" and thus a violation of his due process rights. This claim was presented on direct appeal. The court of appeal held that the sentence did not in fact violate state law, Ex. E at 12, and the state court's decision on an issue of state law is binding on this Court in a habeas proceeding, <u>see</u> <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) (state court's interpretation of state law, including one announced on direct appeal of challenged conviction, binds federal court sitting in habeas corpus). As a result, Petitioner cannot establish the predicate of his claim, that the sentence was unauthorized. This claim is without merit.

### CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. <u>See</u> Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. For the reasons set out in the discussion above, petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus and a COA are DENIED.

DATED: April 26, 2011

JAMES WARE
United States District Judge